## WILLIAM M'CUTCHEN et al. *v.* JOHN A. MILLER.

1. LIS PENDENS: RULE AS TO PURCHASERS.—It·is well established, that the purchaser of property *pendente lite* is bound by the decree, in all cases where the title to the property is adjudged to be in the complainant, or where, at the date of the decree, he has a subsisting lien on the property, created either by operation of law, or by contract, and the consequent right to subject the property to the payment of his debt. But where no right to the property is asserted by the complainant, or adjudged to him by the decree, and where there is no lien existing at the time of the purchase, or at the date of the decree, the purchaser *pendente lite*, for a valuable consideration, and without notice of the pendency of the suit, will not be affected by the decree. HANDY, J., dissented.

2. SAME.—A complainant who seeks the aid of a court of equity, to set aside a fraudulent assignment made by his debtor, and to subject the property so assigned to the payment of his debt, does not thereby assert the title to the property to be in himself but in the defendant, his debtor; and if he have no lien on the property, there is nothing in the pendency of the suit which can prevent the exercise by the defendant, as against the complainant, of his *jus disponendi* in relation to the property in controversy, and he may make a valid conveyance of it, unaffected by the decree. HANDY, J., dissented.

3. CHANCERY: EFFECT OF SUIT TO SET ASIDE FRAUDULENT ASSIGNMENT.—A suit in equity, by a judgment creditor, for the purpose of setting aside a fraudulent assignment of the property of his debtor, and to subject it to the payment of his debt operates merely to aid the complainant in obtaining the benefit of his judgment, as it might exist, and according to its legal operation *at the date of the decree;* it does not give the judgment any new vitality, or a more extended operation than it has at law, and hence, if during the pendency of the suit the judgment loses its lien at law by lapse of time, it will not be preserved by the suit in equity.

4. LIS PENDENS.—The filing of a bill in chancery, by a creditor, for the purpose of setting aside a fraudulent assignment, and having the property sold and applied to the payment of his debt, *gives to the complainant a specific lien on the property,* and is tantamount to a seizure of it for the purposes of the suit; and a party purchasing the property *pendente lite,* is bound by the decree even after the lien of the claim sought to be enforced has expired. Per HANDY, J., dissenting.

APPEAL from the Superior Court of Chancery. Hon. Charles Scott, chancellor.

A very full statement of the case will be found in the opinion of the court.

*D. Shelton* and *T. A. Marshall,* for appellants.

Our first position is this : *The case is one in which Miller has no advantage of us on the ground that he, or that Burke, Watt & Co., are purchasers for a valuable consideration without notice.*

The decree under which we claim the right to sell these slaves determines absolutely the relative rights of Laughlin and M'Cutchen. It annihilates the title of Laughlin as against M'Cutchen, settles M'Cutchen's right to have the property sold for payment of the judgments, and decrees a sale for that purpose, notwithstanding the pretended title of Laughlin. But Miller's right accrued only under Laughlin's title; if, therefore, Miller is entitled to relief against that decree, it must be upon some right, legal or

equitable in himself superior to Laughlin's supposed right, and must have originated either in himself or in Burke, Watt & Co. Accordingly, Miller does attempt to show by his bill a supposed ground of relief originating first to Burke, Watt & Co., and afterwards to himself. It is, that Burke, Watt & Co. were purchasers from Laughlin, and that complainant is a purchaser from Burke, Watt & Co., both for valuable considerations and without notice. Suppose we were to admit the want of notice to either. Complainant would then be in this attitude. He comes into this court by bill, and prays relief against a decree made relative to property *in specie*, on the sole ground that he is a purchaser pending the litigation for a valuable consideration without notice of the litigation. We well know that a purchase for a valuable consideration without notice is a good *defence* in Chancery, but we are no less certain that it constitutes no ground *for relief* in Chancery. It is admirable for *defensive*, worthless for *offensive action*. Not a case can be found in which *relief* has been granted on that ground. Cases are not wanting in which it has been decided that relief will not be granted on that ground. In *Patterson* v. *Slaughter*, Ambler, 293, the defendant sought to file a cross bill, praying relief on the ground that he was a purchaser for a valuable consideration without notice of complainant's right. Lord Hardwick refused the application, because "the title of a purchaser for a valuable consideration without notice is not ground *for relief*, though it is *a good defence.*" In *Beckman* v. *Frost*, 18 Johns. R. 561, a mortgagee, with power of sale under a mortgage for $3000, advertised the property for sale to raise that sum, the complainant, who was in possession, and a purchaser from one who had purchased from the mortgagor, filed his bill, alleging that the mortgage, as registered, was only for $300, stating that he and his vendor bought the property, and paid for it, with no knowledge or suspicion that the mortgage was for any sum greater than $300, states a tender of that sum to the mortgagee, and brings it into court and prays for a perpetual injunction. The court dismissed the bill. Spencer, C. J., says: "If the defendant has an equal claim to the protection of a court of equity to defend himself as the plaintiff has, the court *will not interfere on either*

*side;* this is the case, when the defendant is a purchaser for a valuable consideration without notice, this he may plead in bar of the suit; but the respondents attempt to make use of the fact of a *bona fide* purchase without notice as a substantive ground of equity for offensive operation, thus inverting the order of proceeding," and he decides against the assumed ground. 18 Johns. R. 562.

Woodward, J., coming to the same conclusion, says: "The scope of respondent's bill is to obtain relief against the appellants' mortgage, on the ground that they are purchasers for a valuable consideration without notice. The question is, whether, according to the course of the Court of Chancery, this relief can be sought affirmatively by bill." 18 Johns. R. 565, 566. After arguing the question, he concludes: "From the preceding considerations it abundantly appears, that being a purchaser for a valuable consideration without notice, does not of itself form a substantive ground of relief by bill." Ib. 568.

The two cases above cited ought to be conclusive of the question now under argument, *but on principle,* our position on that question must be correct. The sole reason why a purchaser without notice is protected, is this, that defendant has in good conscience an equal claim to the protection of a court of equity to defend his possession honestly obtained as the plaintiff has to assert his claim, and therefore a court of equity will not interfere on either side, but maintain a strict neutrality. Such is the principle of the plea, as stated in every one of the books; that principle necessarily makes it only a means of defence, and never a ground of attack. The books never state it otherwise than as a defence only. 1 Mad. Ch. 207, 208; 2 Ib. 321; 2 Ves. Jr. 457; 1 Font. Eq. ch. 4, § 25, ch. 5, § 3; 9 Ves. 24; Mitf. Pl. 215-220; Beams, Pl. in Eq. 241; 1 Sm. Ch. Prac. 423.

Another consideration shows that our position is inevitably right. If a purchase for a valuable consideration without notice be available to a complainant as a ground of relief, then to get that relief, complainant is under the necessity of proving those facts, for it is necessary for him to prove every material allegation of his bill, and therefore, without proof that he had no notice, his case is not made out. But how will a complainant ever prove that he had no notice?

M'Cutchen et al. *v.* Miller.

he alone of the whole human race could swear that he had no notice, but his oath is no evidence to prove material allegations of his bill —and so *the want of notice*, which, for such a bill, would be its very *gravamen*, is wholly unsusceptible of proof, and therefore, practically, a decree for relief never could be based on such a ground. We want no better case than this to illustrate the propriety of this position. Complainant has proved his purchase for a valuable consideration; but he has not proved, and it is impossible that he ever can prove, that he had no notice of defendant's claim; the thing is not susceptible of proof; but deprive the bill of that feature, and what is it—nothing but a naked purchase pending the litigation, without a pretence of equity against M'Cutchen's decree.

But we are answered that this bill is brought for the purpose of protecting complainant's possession of the slaves, and, therefore, it is a defensive measure, and the court ought to grant the relief.

There is not a position that we have taken that does not show the fallacy of this assumption. 1. Upon authority. The case of *Patterson* v. *Slaughter* was not only for the purpose of defending possession, but was a cross bill, the object of which was a defence to the original bill of the adverse party; but to make the matters of the cross bill a good defence, it was necessary that relief should be granted defendant on the cross bill, he being a purchaser for a valuable consideration without notice. It was, therefore, a proceeding not only defensive as to the possession, but defensive as to the suit. It was, however, a defence, for success in which offensive action was required in his behalf; that offensive action the court refused to aid him in. Ambler, 293.

The case of *Beckman* v. *Frost,* was in principle precisely like the one at bar. The complainant in possession sought to enjoin a sale under a mortgage for $3000, on the ground that it was registered as a mortgage for $300, and that he was a purchaser without notice, except for $300, which he offered to pay. It was, therefore, as much a defensive proceeding as the present; one sought to enjoin a sale under a mortgage, the other seeks to enjoin a sale under a decree. The court in that case dismissed the bill, and so it should in this. 18 Johns. R. 561.

2. Upon principle.—The principle of the rule as already stated,

is that of strict neutrality—non-interference, because the equitable claims of each party are equal. But if relief be granted to a purchaser in possession because he purchased for a valuable consideration without notice, it is a violation of the neutrality,—it is interference in his behalf. It is no better than that kind of neutrality which would abstain from interference so long as *one* of two combatants was victor, but would *assist* him to conquer when he was likely to be vanquished.

3. The want of notice to complainant could no more be proved by him, when he was in possession of the property, than if he were not in possession, and therefore, practically, a decree of relief could no more be granted upon such a ground in the one case than in the other.

If the foregoing principles be correct, then our first position is true. That the case is one in which Miller has no advantage of M'Cutchen on the ground that he is, or that Burke, Watt & Co., are purchasers for a valuable consideration without notice; but is one in which both he and they are to be regarded as having bought the slaves with knowledge of the adverse rights of defendant, and consequently is to be determined by a trial of the rights of the parties, without reference to notice.

But another view of this case inevitably brings us to the same conclusion. We contend that the pendency of the suit at the time Burke, Watt & Co. bought, and at the time complainant bought, makes them chargeable with notice. We will not argue the general rule that a pending litigation is notice to the world. It will be found distinctly stated in 1 Johns. Ch. R. 576; 2 Ib. 444; 2 Ves. & B. 205; 2 Ball & Beat. 167; 3 Atk. 243; 1 M'Cord's Ch. R. 264. Story's Equity Jurisprudence, vol. 1, page 434. §§ 405, 406.

But Miller claims exemption from the rule, on the ground that Burke, Watt & Co. were non-residents of the State, though the contract was made in the State by their agent, and also on the ground that his purchase from Burke, Watt & Co. was made out of the State, though he was a resident of the State. No such exceptions to the rule exist. See 9 Dana, 376. Every authority states the rule as one of universal application to all purchasers

*pendente lite.* The reasons given for the rule show that it is a rule of universal, and not of limited application. In the case of *Murray* v. *Ballou*, 1 Johns. Ch. R. 576, the chancellor having stated the rule as a universal one, answering the objection that hardships may result from its application, says: "I have no doubt the rule will operate with hardship upon a purchaser without actual notice, *but this is one of the cases in which private mischief must yield to general convenience;*" Ib. 576. "The only safe and efficient means *to prevent fraud and injustice* is to charge the purchaser with dealing with the trustee at his peril. It is his business to inquire and look to the person with whom he deals. *He* can always be safe if he uses due diligence, *but the other party* has no means of safety beyond his application to the court;" Ib. 577. "Litigating parties are exempt from the necessity of taking any notice of a title so acquired. As to them it is as if no such title existed, *otherwise suits would be interminable, or which would be the same in effect, it would be in the pleasure of one party at what period the suit should be terminated.*" Ib. 580.

The same reasons are reiterated in *Murray* v. *Lylburn*, 2 Johns. Ch. R. 444.

In the case in 2 Ball & Beatty, 167, the lord chancellor having stated the rule as a universal one, says: "If this rule were not attended to *there would be no end of any suit, the justice of the court would be constantly evaded,* and great hardships to the suitor necessarily introduced. *It is extremely difficult to draw any line and very dangerous to allow of the rule being frittered away by exceptions.*"

In the case in 2 Ves. & B. 205, the chancellor, after stating the rule, says: "With regard to them (the litigants) it is as if it (the sale) had never existed, *otherwise suits would be interminable.* The *lis pendens* is presumptive, if not actual notice, and the purchaser is in the same situation in which the vendor stood."

Now, all the foregoing reasons for the rule are as forcible when applied to sales made out of the State, or to sales made in the State, to non-resident purchasers, as they are to sales made in the State to resident purchasers.

If to hold the latter chargeable with notice will *prevent fraud and injustice*, will it not *promote fraud and injustice* to exempt the former from being chargeable with notice. If it is the business of the latter *to look to the person* with whom he deals, does not the same obligation of vigilance rest on the former. If the litigant has *no means of safety* against the latter, if he be not chargeable with notice, has he any additional means of safety against the former if he be not chargeable with notice. If *suits would be interminable* unless the latter were chargeable with notice, would they be less interminable if the former might purchase exemption from the charge of notice. If the justice of the court *would be constantly evaded*, unless the latter be chargeable with notice, how much more sacredly would that justice be protected if its decrees can be defeated by selling to the former exempt from the charge of notice. If there would be *great hardships* upon suitors, unless the latter be chargeable with notice, would the hardships be avoided or alleviated if the court's decrees can be evaded by sales to the former exempt from the charge of notice.

It is plain that the prevention of fraud and injustice, the safety of the rights of the litigants, the necessity of terminating suits, the prevention of evasions of the decrees of the court, the prevention of hardships to suitors, in a word, all the principles on which the rule is founded, require that *all* purchasers *pendente lite* shall be chargeable with notice, whether such purchase was made in the State or out of it; whether made by a resident or non-resident. To hold otherwise is to offer inducements to run slaves that are in litigation from the State and to sell them, for the purpose of defeating the effects of a recovery. It is to hold out allurements to non-residents to become purchasers of property in litigation in the State, and to give them protection in their purchases under circumstances in which our own citizens would be held bound by the decree. The questions are fully decided in *Fletcher and Sharp* v. *Fenell*, 9 Dana, R. 376–380.

We might here close the argument on the question of notice, but referring to the two purchases, we believe that neither of them can be brought within any possible exception to the rule. The

two purchases are wholly distinct from and independent of each other. For Miller to succeed, one or the other must constitute upon principle an exception to the rule.

The purchase of Burke, Watt & Co., was made by their agent in the State of Mississippi; only the *title* was conveyed in Louisiana; that agent is chargeable with constructive notice; he comes not within either of the supposed exceptions to the rule; he was a resident of the State and purchased in the State, and Burke, Watt & Co., his principals, having made the purchase by him in the State are through him as much chargeable with notice as if they had bought personally in the State of Mississippi, or as if they had been residents of the State at the time of their purchase. Let us illustrate. The registry of a mortgage is constructive notice, at least in the county. Will it be said that a non-resident may, by an agent, purchase in the county where the mortgage is registered, and claim protection as a purchaser for a valuable consideration without notice, only because being a non-resident he did not really know that any such mortgage was registered? So also, a pending litigation is constructive notice throughout the State: can it be said that a non-resident may, by an agent, purchase the property in litigation within the State and claim protection against the decree made in the cause, upon the ground that he is a purchaser without notice of the litigation? There is not a decent pretext for claiming that Burke, Watt & Co. are exempt from the rule that a purchase *pendente lite* is chargeable with notice of the pending litigation.

The purchase of Miller from Burke, Watt & Co., was made in New Orleans, but Miller was a resident of Mississippi at the time of his purchase and during the whole time the suit of *Robinson et al.* v. *Green, Laughlin et al.* was pending.

Now, as a resident citizen of the State, Miller had constructive notice of the pending litigation. His temporary absence in New Orleans while buying these slaves, did not absolve him from that constructive notice. If constructively or actually he knew of the pending litigation before he went on his brief visit to the city, it did not obliterate or suspend his knowledge of the suit even during his absence. But it is said he might have notice of the pending

litigation and yet not know the identity of the slaves; that buying in another State and from a person not a party to the suit, he had no reason to suspect these to be the slaves in litigation, and therefore he ought not to be chargeable with notice. We cannot see the force of the objection, for it only proves that the rule operates hardly on Miller, and we answer that the same would be true if he had bought them from Burke, Watt & Co., or any other person not a party to the suit in the State of Mississippi. He had just as much reason in New Orleans to suspect them to be the slaves in litigation as he would have had in any county in Mississippi, and yet as to such a purchase in the State he would certainly be chargeable with notice. In both cases the rule might operate hardly, but in both cases "private mischief must yield to general convenience." In both cases the purchaser could be safe by using vigilance, but in neither would the litigating party have any means of safety if the purchaser took the property discharged of the litigation. The purchaser's means of safety would be as great in the one case as in the other, and precisely the same in the two cases, to wit: an inspection of his vendor's title before he purchased. If Miller had taken that precaution before he purchased he would have been safe ; that title would have shown the identity of the slaves with those involved in the suit, for it would have shown a conveyance from Laughlin, one of the defendants, of slaves indentical in name and description with those involved in that suit. He had only to use the same diligence which would have been necessary if he had bought in the State, and his safety would have been the same. But on the other hand we were powerless, for the prevention of the evil : we had nothing and *could have* nothing to do with the transaction. To hold now that he shall be protected and granted relief against us, and that we must bear the mischief done, is to reward him for his want of caution and punish us for his delinquencies, to assist a careless purchaser *pendente lite* against an innocent party whose rights are in law and equity at least equal to his, whose right to the property is *established by decree against the right purchased* by him, and who was perfectly powerless to prevent the injury done by the incautious purchaser.

M'Cutchen et al *v.* Miller.

Under whatever aspect we examine the question of notice, this case is one in which Miller has no advantage of us on the ground that he, or that Burke, Watt & Co., are purchasers for a valuable consideration without notice, but is one in which both he and they are to be regarded as having bought the slaves with knowledge of the adverse right of M'Cutchen, and therefore we may rest the case not upon any supposed ground of relief, because they are purchasers for a valuable consideration without notice, but upon a trial of paramount rights between M'Cutchen and Miller, and if, upon any one of the points urged, this conclusion be correct, we have but little more to do in the argument of this cause.

Our second position is this: *Miller is bound by the decree made in the case of W. Robinson et al.* v. *Green et al., and must therefore submit to the execution of that decree by sale of the slaves to pay the amount therein decreed to be the complainants'.*

Upon examination as to the condition of the three judgments at the time the decree was rendered in the *Winslow Robinson case,* and at the time Miller filed his bill, it will be found that all our judgments were rendered in 1838 and 1839. That under the acts of 1841 and 1844, Hutch. Code, 880, 881, (generally known as the abstract and enrolment laws) Robinson lost the *lien* of his judgment, but the other two creditors preserved the liens of their judgments. The bill contains no pretence that the *lien* of these two judgments has been lost. It contains no charge that any one of the judgments has not been kept alive; no allegation that either of the judgments has become extinct under the limitation act of 1844. Hutch. Code, 830. No relief is asked upon any such pretences.

The case then is, that in 1850, when the decree was rendered in the *W. Robinson case, all three of the judgments* were alive and in full force; two only were *liens* upon property. In 1851, when Miller filed his bill, *all the judgments were in precisely the same condition,* and they are still so; no new right has been created or lost since the decree was rendered. The decree which we obtained against Laughlin was that his title to the slaves in controversy was void and null as against our three judgments, and that he *should* be perpetually enjoined from setting up any right

to them under his bills of sale. It determined that certain sums named in the decree were due on those judgments, that we were entitled to have those judgments paid by sale of the slaves, and decreed a sale for that purpose; Miller claims as a purchaser taking title under Laughlin *pendente lite.*

Now, whether the judgments are *liens* or not can make no difference in this cause. As judgment creditors, after return of *nulla bona*, we had the right to file our bill to set aside Laughlin's fraudulent title, whether we had a lien or not. The judgment gave that right, not the lien. It will scarcely be pretended that the existence of a *lien* is indispensably necessary, in order to sustain such a bill, though it is necessary that a *judgment* shall have been obtained. If a *lien* be indispensable, then such a bill could only be filed to reach property in a county where the judgment was enrolled, for in no other county would the lien exist. It could never be filed to reach equitable assets, for the judgment is no *lien* upon these.

As judgment creditors of Green, we obtained a decree setting aside Laughlin's fraudulent title, and decreeing the sale of the slaves to pay our judgments. That decree forever precluded Laughlin from setting up against us his pretended title; forever precluded him from saying that we were not entitled to sale of the property for the payment of our judgments, and now what is the question—only this: Is Miller (who is a purchaser taking title under him by purchase made *pendente lite*) entitled to relief against that decree?

"There is no principle better established, none founded on more indispensable necessity, than that the purchase of the subject-matter in controversy *pendente lite*, does not vary the rights of the parties in that suit, who are not to receive any prejudice from the alienation." 2 Johns. C. R. 444. "He who purchases pending the suit is bound by the decree that may be made against the person from whom he derives title. The litigating parties are exempted from taking notice of a title so acquired; as to them it is as if no such title existed." 1 Johns. C. R. 580; 11 Ves. 194. "He who purchases during the pendency of the suit is bound by the decree that may be made against the person from whom he derives title;

as between the litigating parties, any person coming in by convey-ance pending the suit, is bound by the right of him from whom he takes; as to them it is as if no such title existed." 2 Ves. & B. 206. And we might multiply references almost infinitely. The rule is so well established as to have grown into a maxim, "*Pendente lite nihil innovetur.*" See also 9 Dana, 376–380.

If there is any principle in law or equity that may be con-sidered settled, it is that a purchaser *pendente lite* is bound by the decree that may be made against the person from whom he derives title, but we have already shown that the decree is forever conclu-sive against Laughlin, under whom Miller claims by purchase *pen-dente lite ;* how then can Miller escape the binding effect of the decree ? It is impossible, unless it be upon some supposed equity that did not exist in Laughlin's favor, but we have shown that at the time of that decree our judgments were in precisely the same condition that they were when Miller filed this bill; we had lost none of our rights in the interval. The bill pretends to no such thing; it sets up but one pretence, that pretence is, that Miller is a purchaser for a valuable consideration, without notice. We have already shown, that for several reasons he is entitled to no relief against the decree on that ground. Miller must consequently abide the decree made for the sale of the slaves to pay said judg-ments, and look to his vendor for indemnity.

When the motion to appoint a receiver in the case of *Robinson* v. *Green* was argued, defendant's counsel contended then, as com-plainant's counsel do now, that *bona fide* purchasers, without notice from defendants, could not be affected by the decree rendered in that case, and hence they insisted that the receiver could only take such property as he might find then in possession of defend-ants. The chancellor, however, believing the law to be otherwise, required by his interlocutory decree, the defendants *and all others claiming under them* (whether with or without notice,) since the 6th day of October, 1843, the date of filing the bill, to deliver possession of the negroes (those now in controversy included,) to the receiver. The precise question now made by Miller's counsel was decided against them in that case. The final decree held the

negroes to be bound for the debts due Robinson et. al. Not that their judgments were *liens* upon them, but whether the liens had then *expired or not*, the *negroes* were *decreed* to be *sold* for the *payment* of *those debts.* That decree may possibly have been erroneous. But whether so or not, we insist that it is *binding upon the defendants in that case and all others claiming under them, until set aside or reversed by a competent court.* The rights of Miller, therefore, to these negroes as against Robinson et. al., or M'Cutchen, their assignee, we confidently submit are concluded by that decree.

*T. I. Wharton* and *A. Burwell*, for appellees.

*Yerger* and *Rucks*, on same side.

The appellee certainly has a clear and indisputable title to the slaves, and the decree of the chancellor must be sustained.

Because he was a *bona fide* purchaser for valuable consideration without notice, in the State of Louisiana, and by the laws of that State acquired a valid title to the slaves.

The judgment creditors, under whom M'Cutchen claims, had *at no time* a *title or right* in the slaves; that was always in Green; they had at best a mere lien, or right to have the property disposed of to satisfy their executions and judgments, in preference to subsequent purchasers or incumbrancers. The *jus disponendi*, or right to dispose of the property, remained in Green, subject only to this lien of the judgment creditor, which lien did not and could not have any extra-territorial force or effect. When, therefore, the *actual* owner of the property, being in the peaceable and rightful possession of it, removed it beyond the State, and sold it in a foreign jurisdiction to a *bona fide* purchaser, for value, without notice of the lien, the purchaser acquired a valid title, and took it discharged of the mere general lien, which could have no extra-territorial force. The courts of Louisiana have applied this rule to mortgages executed out of the State. It applies with much greater force to a mere general lien by judgment, which, as Judge Story remarked, in 1 Mason, C. C. R. 319, is "neither a *jus ad rem* nor a *jus in re*, but a simple right of retainer." For decisions

in Louisiana, see 8 Martin, 221; 4 Lou. 43; Ib. 68; 19 Ib. 523; 4 Ala. 16; 9 R. 34; 11 Ib. 450.

But if it be conceded that when John A. Miller bought the property in Louisiana, in 1845, he took it subject to the lien of the judgment creditors, he will nevertheless hold the property now, discharged from any lien or incumbrance.

All the judgments mentioned in the suit of Robinson against Green and others, were rendered prior to the 24th of February, 1844. By the Statute of Limitations, passed on that day, sec. 13, it was declared that " no judgment heretofore rendered, should operate as a lien on the property of the defendant or defendants, for a longer time than two years from the passage of this act."

This court, in several cases, has given a construction to this act, and in doing so has held, that a party purchasing property on which a judgment lien existed, could not be disturbed in his possession by the judgment creditor, unless he enforced his judgment by an execution and sale under it, before the expiration of the two years mentioned in the act.   11 Smedes & M. 43; 12 Ib. 473; Ib. 697; 13 Ib. 427; Ib. 509; 3 Cushman, 571.

But it is said that the suit of *Robinson and others* v. *Green and others*, being *lis pendens* when John A. Miller bought, was notice to him of the claim of the judgment creditors of Green, and that he is therefore bound by the decree.   Conceding the fact to be that Miller was a purchaser "*pendente lite*," it still will not place the appellants in any better situation.   The bill was only filed to vacate certain fraudulent conveyances made by Green, in order that the judgment creditors might have execution of their judgments at law.   No levy was ever made, no injunction of a sale of the property by Green, and no receiver appointed to hold it.   The judgment creditors, therefore, had a mere lien; no *jus ad rem* nor *jus in re*.   The only notice of the *lis pendens*, was notice of this state of facts.   As the judgment creditors had no right of property, and asserted no right of property, but only sought execution of their judgments at law, the right to sell the property still remained in Green, to whom it belonged, subject only to the lien of the judgment; a purchaser from him would buy a valid title to the property, subject only to this incumbrance.   Whenever this

incumbrance was removed, vacated, or destroyed, he would from that time be absolute owner of the property, with an unincumbered title; and notice of these incumbrances will not affect his rights in any way, whether that notice was actual or only implied; or in the case of a suit pending, which is implied notice of the claims of the parties to it; and such is the decision of this court, in *Homer* v. *Torpley*, 9 S. & M. 315, in which the court say, "The title of the plaintiff in error has been attempted to be sustained on the ground that the defendants in error had notice of the judgment under which he claims. *The doctrine of notice can have no application whatever.* The judgment *ceased* to be a lien because it was not recorded; and notice of that which was not a lien, amounts to nothing."

So in this case, the judgments ceased to be liens by the lapse of time, and not having been enforced by execution and sale before the time fixed for the expiration of the lien, a purchaser in the interim would hold the property discharged from the lien; and so, too, this court held, in the cases before cited.

FISHER, J., delivered the opinion of the court.

The appellee filed this bill in the Superior Court of Chancery, for the purpose of enjoining the appellants from enforcing a decree which they had obtained against Thomas M. Green and others, on the 18th day of January, 1850, in the said court, so far as the said decree embraced certain slaves in the possession of, and claimed by the appellee. The chancellor, upon final hearing, pronounced a decree for the complainant, from which this appeal has been prosecuted.

The counsel of the respective parties appear to agree as to the main facts, and we will, therefore, in stating the case, be governed by the abstract of appellants' counsel, and then determine upon such statement, whether they are entitled to a reversal of the decree of the chancellor.

"In 1839, Mr. Robinson obtained judgment against T. M. Green, for $14,844, which was never enrolled in Warren county, where Green resided, and where the property in controversy was, under the Act of 1844. Other persons had, previous to 1839, obtained

judgments in Warren Circuit Court, which were duly enrolled, under the Enrolment Act. Executions having issued upon all of said judgments, were returned *nulla bona.* Robinson, on the 6th of October, 1843, filed his bill in the Superior Court of Chancery, to which the other judgment creditors became parties, alleging that William Laughlin had become the fraudulent purchaser of Green's large estate, and seeking to set aside the sheriff's bill of sale to Laughlin, for the negroes in controversy, and to subject the property to the aforesaid judgments. On the 10th of January, 1850, an interlocutory decree was made, appointing a receiver; and the defendants to the bill, as well as all persons claiming under them by purchase since the bill was filed, were required to deliver the slaves to the said receiver. On the 18th of January, 1850, a final decree was made, directing the commissioner to take possession of, and sell all the property so fraudulently conveyed, and decreeing that the sheriff's bill of sale to Laughlin was void as to said creditors, and perpetually enjoining him from setting up or asserting any title or claim to said slaves, under said bill of sale.

"Pending this suit between Robinson and Green and others, Burke, Watt & Co., of Louisiana, obtained a judgment against Mrs. Green, wife of the defendant, Thomas M. Green, and purchased the slaves now in controversy in payment of said judgment; the terms of the trade were agreed on at Vicksburg, between the agent of Burke, Watt & Co. and Thomas M. Green and wife, but the title being in Laughlin, who then resided in New Orleans, the slaves were sent thither, and he conveyed them to Burke, Watt & Co., who soon thereafter sold them to the appellee, Miller, for a full and fair consideration. Miller was, at the time of his purchase at the date of the decree, and at the filing of this bill, a resident and citizen of Washington county, in this State. It is alleged, and may be treated as a fact established, that neither Burke, Watt & Co., nor Miller, their vendee, had any actual notice of the pendency of the suit of Robinson against Green and others, in the Superior Court of Chancery. The slaves, after Miller's purchase, having been brought back by him to this State, and placed upon his plantation in Washington county, were seized by the commissioner, under the decree in the case of *Robinson* v.

*Green and others;* and the object of the present litigation is, to perpetually enjoin the parties claiming the benefit of that decree, from enforcing it as to the slaves in controversy in the present suit.

Upon this state of case, the counsel for the appellants has presented the following questions for our consideration:

1. That the equities of the parties, stating the case in the most favorable light for the appellee, are equal; and the appellants having both the legal advantage and the prior equity, must succeed.

2. That it is wholly immaterial whether the appellee, or the persons from whom he purchased had, in fact, actual notice of the pendency of the suit or not; the suit itself was notice, or at least all the notice the law required; and the purchasers are as much bound by the decree as if they had been parties to the controversy.

The general correctness of each of these positions may, to the fullest extent, be admitted. The question is not so much as to what the rule is, as to the state of facts necessary to bring the case within its operation. If Miller, by his purchase from Burke, Watt & Co., acquired but an equity, and if the appellants have an equal though prior equity, or have a legal right, unaffected by any superior equity of the appellee, his bill must of course be dismissed. We may, therefore, with these general remarks, pass from the first to the consideration of the second proposition argued by counsel; as the complainant must recover upon the strength of his title, or, more properly speaking, must show a title superior to the rights of the appellants under the decree, to satisfy which, they claim the right to subject the slaves in controversy.

It may at least admit of doubt, whether Burke, Watt & Co. purchased, through their agent, the slaves at Vicksburg, in the county of Warren, or whether the purchase was consummated at New Orleans. But let it be conceded that the purchase was completed at Vicksburg; the question is, whether the doctrine of *lis pendens* can be made to apply to the purchasers, even under that state of case. This doctrine is at this day so well understood, that it is not deemed even necessary to cite authorities to illustrate it.

The general rule is, no doubt, as contended for by counsel, that a purchaser *pendente lite*, takes the property, subject to the rights of the complainant or plaintiff, as settled by the final decree or judgment of the court; for otherwise there could never be an end to litigation. But to hold that the rule has no exceptions, or is not varied by the nature of the litigation, would be almost, if not quite as unreasonable, as to deny its existence altogether. As already remarked, the inquiry is not what the rule is, but whether this case falls within its operation. The rule had its origin in controversies touching real estate; but it may be conceded that at this day it applies with equal force to controversies in regard to personal property; and it is only by analogy to the law, that it is applicable to proceedings in courts of equity. Where the suit is brought to recover property, and the party is successful, the rule is one of almost universal application; the purchaser *pendente lite* takes, subject to the rights of the plaintiff, as settled by the judgment of the court. Nor can the purchaser in such case complain of the harshness of the rule, since the plaintiff, even if driven to an original action, could recover upon the strength of his title to the property, as settled by the judgment. The purchaser from the defendant pending the suit, acquires only such title as the defendant can convey; and the judgment against the defendant is, by operation of law, a judgment, so far as it relates to the recovery of the property, against all who acquire his title or possession of the thing pending the litigation. This rule, whether it operates harshly in some cases or not, is nevertheless one of necessity, and, as such, must be applied in all cases where a party is adjudged to be the rightful owner of property, and where another, pending the controversy, comes into possession of it under the defendant to the suit. It is not necessary even to cite authority to support this doctrine.

But, as already remarked, the question in this case is not what the rule is, but whether the facts bring the case within its operation. Robinson, who obtained the decree in the Superior Court of Chancery, under which the appellants claimed, asserted no title to the slaves in controversy, but only that Laughlin's title, so far as Green's creditors were concerned, was null and void, and ought,

as to them, to constitute no impediment to the enforcement of their judgments, although such title was, by the express provisions of the Statute of Frauds, valid as between the parties to the fraudulent agreement. It must be borne in mind that this judgment was never enrolled, and hence it ceased to operate as a lien upon Green's property after the first of July, 1844. Applying the rule, then, with the utmost rigor to Burke, Watt & Co., who purchased in 1845, and from whom the appellee claims—what is the extent of the notice conveyed by the pendency of Robinson's bill in the Superior Court of Chancery? Only that he had a judgment for a certain sum against Green, and that the property which they were about to purchase, must be treated as Green's, so far as he, Robinson, or other judgment creditors were concerned. The judgment not being a lien upon the property, Green was not restrained from selling, nor Burke, Watt & Co. from purchasing the property. The pendency of the suit was only notice, if notice at all, of the title asserted; and we have already seen what this title was at the date of the purchase by Burke, Watt & Co. —a mere right to have the property sold to satisfy a judgment which had lost its lien. It is not deemed necessary to cite authority to prove that where a man's property is unincumbered by lien or otherwise, he has full power to sell it to a *bona fide* purchaser for a valuable consideration. If Green, then, had full power to sell, and Burke, Watt & Co. to purchase, what possible objection can be urged against their title? But it is said that Robinson's suit was then pending, and having commenced his suit, he had acquired certain rights in consequence thereof. A suit is commenced and prosecuted to obtain an existing right, and not for the purpose of creating a right. The process provided by the law to enforce the judgment having been *rendered nugatory* in consequence of the fraudulent combination between Green and Laughlin, the aid of a court of equity was invoked, to enable Robinson to obtain the benefit of his judgment, as it might exist, and according to its legal operation at the date of the decree, and not to give to the judgment any new vitality or operation other than such as the law gave to it. The decree could no more affect the title of Miller, which had been acquired by fair purchase many years previously,

than it could affect the title of strangers to the controversy, unless it appeared that Miller took the property incumbered by the lien of Robinson's judgment, or that his pretended title was in fact Robinson's title—supposing that to have been the subject of controversy. This is the true test of the rule. The purchaser *pendente lite* is bound by the decree, when the title to the thing is adjudged to be in the complainant, or when, in consequence of a subsisting lien, whether created by contract or by operation of law, he had a right, at the date of such decree, to subject the property to satisfy the debt, to secure which the lien then existed. In the one case the complainant but follows his title, by requiring the purchaser to surrender the property; and in the other he is but pursuing his lien upon the property. But it is believed that no case can be found, where the complainant had neither title to the property, or a lien upon it at the time of the purchase by an innocent party, that such party is bound by the decree. It is the complainant's right to the thing, or lien upon it, that affects the purchaser pending the suit.

This doctrine is, however, fully settled by authority. Take, for example, an unregistered mortgage, which, as between the parties and all who have notice, is binding. A bill to foreclose is filed, and pending the suit the mortgagor sells to an innocent purchaser without notice for a valuable consideration. Here is a purchase *pendente lite*. But it is now well settled, that the doctrine of *lis pendens* does not apply in such a case, for the plain reason that the law only required the purchaser to examine the register's office to ascertain incumbrances upon the estate, or conveyances to other persons; and finding none there, he had a right to presume that none in fact existed. *Newman* v. *Chapman*, 2 Raw. 93; 19 Ves. 439. So in this case Burke, Watt & Co. were only required at the date of their purchase to examine the judgment roll in the proper office, to ascertain what judgments bound Green's property. The judgment not being enrolled, they were not required to take notice of proceedings in other courts to enforce it. It was only required of them to know that it did not bind the property which they were about to purchase. It served their purpose, whether they in fact knew of the judgment or not, to know

its legal operation—and this they knew by not finding it on the roll; for, unless it appeared there, it neither restrained the debtor from selling his property in good faith, or another in like good faith from purchasing.

Responding, therefore, in conclusion, to the position of counsel, we are compelled to hold that the appellee has, to say the least, equal equity with the appellants, besides a legal title to the slaves in controversy.

Decree affirmed.

HANDY, J., delivered the following dissenting opinion:—

I will very briefly state the reasons why I cannot agree with the opinion of the majority of the court.

The original bill, which is the subject of consideration in this case, was filed by the present appellants, as judgment creditors of Thomas M. Green, for the purpose of setting aside certain fraudulent conveyances made by Green, and seeking to have the property thus fraudulently conveyed, subjected and sold by the aid of a Court of Equity, in satisfaction of their executions. These judgments were valid and unsatisfied when the bill was filed, and executions upon them had been obstructed, and been returned "*nulla bona*," by reason of the alleged fraudulent conveyances. Of course, if the conveyances were fraudulent, the creditors had the right to go into equity to have them set aside, and to seek its aid in having the property, fraudulently conveyed, appropriated in satisfaction of them.

When the bill was filed for that purpose, and subpœna served, it was notice to all persons, at least in this State, claiming title under the parties to the suit, by purchase after that time; and such purchasers would stand in no better situation than the parties from whom they acquired their titles. This is the universal doctrine in relation to the effect of a *lis pendens*.

It is undoubtedly true, that a defendant, against whom there is a judgment which is not a *lien* upon his property, may sell that property, and the purchaser may obtain a good title; and upon the same principle of the *jus disponendi*, a party indebted may make a *bona fide* sale of his property. But after bill filed and

M'Cutchen et al. *v.* Miller.

subpœna served, for the purpose of subjecting specific property to the claim or demand of the complainant, and if the claim be of such a nature as that the property ought to be subjected to it, under the rules prevailing in a court of equity, the power of unrestricted disposition in the defendant is suspended or lost, and a purchaser from him *pendente lite*, takes the property subject to the lien which attached upon it by the institution of the suit. And it is immaterial, though the judgment was not a *lien*, when the suit was commenced; for, in this case, it is not pretended but that the execution was in full force, and capable of enforcement against the property, but for the obstacles created by the fraudulent conveyances, and which the bill was filed to remove.

The proper distinction is stated by Lord Hardwicke, in *Edgell* v. *Haywood*, 3 Atkins, 357, thus: "If, therefore, after the judgment, or even after the *fieri facias*, the debtor had assigned the property *bona fide*, and for a valuable consideration, and without notice, it would be good, and prevail against the creditor. But after a bill brought, and a *lis pendens* created as to this thing, such assignment could not prevail."

And it is well settled by authorities in this country, that if a creditor files a bill in his own name, and for his sole benefit, to set aside fraudulent conveyances, and to have the property applied, by the aid of a Court of Equity, to the payment of his judgment, and no lien has been or can be acquired at law, *he acquires a specific lien by filing the bill*, and is entitled to priority over other creditors; and that any party purchasing the property sought to be subjected to the claim, is a purchaser *pendente lite*. *M'Dermott* v. *Strong*, 4 Johns. C. R. 687; *Edmeston* v. *Lyde*, 1 Paige, 637; *Corning* v. *White*, 2 Ib. 567; *Farnham* v. *Campbell*, 10 Ib. 598; *Weed* v. *Pierce*, 9 Cow. 722; *United States Bank* v. *Burke*, 4 Blackf. 141; *Hadden* v. *Spader*, 20 Johns. R. 554; *Blake* v. *Bigelow*, 5 Georgia, 437.

The filing of the bill under consideration being for the purpose, not only of setting aside the fraudulent conveyances, but to have the property sold and applied to the complainants' claims, by the aid of a court of equity, is tantamount to a seizure of the property for the purposes of the suit, and so far as the interests of

M'Cutchen et al. *v.* Miller.

the defendant and of supervening purchasers, after the commencement of the suit, are concerned.

An exception to the operation of the general rule, with respect to the effect of a *lis pendens*, prevails in the case of a bill filed to establish an unregistered mortgage against a *bona fide* purchaser, who had become such since the filing of the bill. And it is held, that the *lis pendens* is not notice to such purchaser, because the law has appointed the place where mortgages must be registered, in order to be notice to purchasers, and if there be no registry there, the purchaser is not held to constructive notice by any other means. The registration in such a case is the only thing that can operate as constructive notice. But in the present case, not only would the lien of the judgment, if it had existed at the time of the purchase be notice, but the commencement of the suit to subject the property to the complainant's claim, independent of the lien of the judgment, is notice in law to all persons who might thereafter purchase from the defendants, pending the suit. If this be not true, the very principle upon which the whole doctrine of *lis pendens* is founded must be subverted, and the jurisdiction of the Court of Chancery, which has attached upon the property in controversy, affords not the least impediment to the free alienation of the property, by the defendant to the action. The consequence would be, that all that a party, who had conveyed his property in fraud of his creditors, and against whom a suit in equity was pending, to set it aside and have the property applied by that court to the payment of the debt, would have to do, would be to prolong the litigation until the lien of the judgment had expired, and the jurisdiction of the court over the subject-matter, which had properly vested, would be utterly frustrated. And if the bill was filed to subject equitable assets, upon which a judgment at law is not a lien, the suit in chancery would afford not the least impediment to the defendant's right of disposition.

It appears to me, with all deference, that such a doctrine is at war with the settled principles of the law of *lis pendens*, and is anomalous and dangerous in the extreme to the proper administration of justice, and that the effect of it would be, that a bill in equity, filed in order to subject property, fraudulently conveyed,

to the payment of the party's just debts, would be but little more than a judicial notice to the party to make other fraudulent conveyances to defeat the jurisdiction of the court.